Filed 12/26/25  In re A.L. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re A.L., A Person Coming Under the Juvenile Court Law. | B345748, B347072 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>C.L. et al.,<br><br>    Defendants and Appellants. | (Los Angeles County Super. Ct. No. 24LJJP00029) |

APPEAL from orders of the Superior Court of Los Angeles County, Donald A. Buddle, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant C.L.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant A.G.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

This consolidated appeal is taken from a parental rights termination order.  The juvenile court assumed jurisdiction over 15-month-old A.L. (Minor) after sustaining allegations that C.L. (Mother) endangered the child by leaving her home alone.  The juvenile court bypassed reunification services for Mother and A.G. (Father), the latter of whom was incarcerated during the proceedings, and ultimately terminated parental rights.  Mother, joined by Father, asks us to decide whether the juvenile court erred in denying the change of circumstances petition she filed before termination of parental rights and whether the parental benefit exception should have forestalled that termination.

## I.  BACKGROUND

### A.    *Proceedings Leading to Dependency Jurisdiction*

In January 2024, the Los Angeles County Department of Children and Family Services (the Department) received a referral alleging Mother was abusing drugs, smoking marijuana, and had mental health issues.[1]  According to Minor's maternal

---

[1]    Mother had previously been involved in a prior dependency case.  Minor has one older maternal half-sibling, Au.L., and in 2017, the juvenile court sustained allegations that Mother and Au.L.'s father were involved in a robbery and subsequent police vehicle pursuit while Au.L. was in the vehicle.  When the vehicle stopped, Mother dangled Au.L. out of the vehicle so law enforcement would not use force when taking her and Au.L.'s father into custody.  Au.L. was removed from Mother and eventually placed under the legal guardianship of maternal grandmother.  Mother was incarcerated as a result of the incident and was released in October 2020.

aunt, Mother said she wanted to commit suicide three weeks earlier.

Later in January 2024, the Department received another referral alleging Mother left Minor home alone while she went to another location to engage in a violent altercation. Mother was arrested at the other location for stabbing someone and for breaking and entering. The incident report prepared by the Los Angeles County Sheriff's Department represented Mother did not have the keys to her apartment when arrested, nor did she know where they were. Law enforcement responded to the family home, forced entry into the home, and found Minor lying on a mattress in the living room, asleep. Minor, who was evaluated by an EMT, appeared to be fine.

When a Department social worker interviewed Mother, she said she picked up her friend Jaime the day before she (Mother) was arrested. Jaime's boyfriend called Mother numerous times while she was with Jaime, but Mother did not answer the calls. When she took Jaime home around 10 p.m. that night, Jaime's boyfriend was waiting outside their residence. The boyfriend began yelling and threatening them, and he slammed and kicked Mother's car. Minor, who was in the car, was crying. Mother managed to leave and took Minor home. After about 15 minutes at home, Minor fell asleep. Mother then left their home and went back to Jaime's apartment to seek an apology from Jaime's boyfriend. According to Mother, Jaime and her boyfriend were waiting outside for Mother when she arrived. The boyfriend had a bat, and Jaime had a knife. Jaime's boyfriend hit Mother with a bat and Jaime tried slashing at Mother. Mother denied having a knife, bringing a knife, or stabbing anyone. Mother said she was about to leave, but someone called law enforcement and she

4

was arrested. Mother claimed she accompanied law enforcement to her home and provided the key to open the door.

According to the Department's reporting, Mother was charged with assault with a deadly weapon and child endangerment. (She was later released from custody on bond.) Minor was taken into protective custody.

The Department thereafter filed a two-count petition alleging dependency jurisdiction was proper under Welfare and Institutions Code section 300, subdivision (b).[2] Count b-1 alleged Mother placed Minor in a detrimental and endangering situation by leaving her at home and unattended without adult supervision for an extended period. Count b-2 alleged Mother failed to make a plan for Minor's safety because she was incarcerated with an unknown release date. Father was not named in the petition; when dependency proceedings commenced, he was incarcerated and not parole-eligible until March 2027. The juvenile court sustained both counts of the petition at an adjudication hearing in March 2024.

The disposition hearing was held later, in July 2024, and Mother testified. She asserted the criminal charges against her had been dismissed on the condition that Mother attend mental health and parenting programs.[3] Mother testified about lessons she claimed to have learned in anger management and parenting classes, though she acknowledged she previously participated in similar classes in connection with Au.L.'s dependency

---

[2] Undesignated statutory references that follow are to the Welfare and Institutions Code.

[3] The record elsewhere indicates Mother was placed on a 12-month diversion program.

proceedings. When asked why allegations had been found true against her in this case, Mother said, "For leaving my daughter at home, but that does[ not] make me a monster. I know I could have went around to do other things to protect her." When asked if she would have handled the situation differently based on what she learned in parenting classes she had taken in the interim, she said yes and explained she would have called the police. When asked how she failed to protect Minor during the incident, she said by not calling the police when she should have. When asked if calling the police would have been the only necessary step to help Minor, Mother said yes. When asked if there was anything else she could have done to protect Minor, other than call the police, Mother said no.

The juvenile court bypassed reunification services for Mother pursuant to section 361.5, subdivision (b)(10) and (12). The court also bypassed reunification services for Father pursuant to section 361.5, subdivision (e).

### B.    Minor's Interactions with Mother and Others

Mother began having monitored visits with Minor in February 2024. The frequency of the visits increased over time, with visits initially occurring a few times per month, and later occurring two to three times per week.

The reports of the visits were generally positive. Mother brought food and toys to each visit, including a swing set to visits at the Department's office. When the visits occurred at the Department, Mother cleaned the visitation room for Minor. Mother showed affection to Minor, and Minor appeared to enjoy the visits. Minor's caregiver reported Minor appeared happy to see Mother during the first visits, but she clung to caregiver at

the beginning.  The caregiver also reported Minor would run to the caregiver at pickup time and did not cry when saying goodbye to Mother.  There were no reports indicating Minor had difficulty separating from Mother at the end of visits.

Shortly after Minor was placed with her caregiver, the caregiver stated she believed Minor needed therapy because she was tripping when she walked.  The social worker similarly observed Minor was unable to keep a stable stance.  Minor was eventually deemed eligible for regional center services due to developmental delays and also received special services through her local school district.  The caregiver took her to her therapeutic appointments.

In both February and May 2024, Minor's caregiver reported Mother visited with Minor via calls, was kind to Minor, and was respectful to the caregiver.  A Multidisciplinary Assessment Team Report from May 2024 advised Minor was bonded to her caregivers and foster family and had adjusted quickly to her new living arrangement.  By November 2024, her caregivers reported they were interested in adopting Minor.

Paternal grandparents visited repeatedly with Minor over the course of the proceedings and they also expressed a desire to adopt Minor.  The Department, however, had concerns about that potential placement.  Father participated in some phone and video calls with Minor.  Maternal grandmother and Minor's half-sibling participated in one visit with Minor on her birthday.  Maternal aunt stated she had seen Minor approximately two times.

*C.     Mother's Change of Circumstance Petition*

In February 2025, Mother filed a section 388 change of circumstance petition, seeking to change the court's orders bypassing reunification services and ordering her visits with Minor be monitored.  Mother asked the court to return Minor to her care and order six months of reunification services.  If the court declined to return Minor to Mother, Mother asked for reunification services and unmonitored visits.

Mother argued she worked hard to improve herself and show the court her commitment to Minor.  She completed seven parenting programs, an anger management program, an outpatient drug program, attended Narcotics Anonymous meetings, and had a sponsor.  Mother asserted the changes she requested would benefit Minor because Minor had a strong bond with Mother, maternal relatives, and her half-sibling.

During an interview the following month, a Department social worker asked Mother why Minor was detained.  Mother responded by saying she was helping her friend out, her friend's partner got violent, Mother put Minor in her home, and Mother wanted an apology from the male partner.  Mother said the male partner got physical and attacked her.  She explained she pled no contest in criminal court, was participating in a diversion program, and was required to do a 52-week parenting course and one year of mental health counseling.

When asked if she had a therapist and a psychiatrist, Mother replied she had a new therapist but she was not seeing a psychiatrist at the time of interview.  When asked for the contact information for her therapist, Mother said a different social worker had the information but also agreed to send the information to the person interviewing her.  Mother, however,

8

had not provided the contact information by the time the social worker completed the report. Mother said she had not been in any further altercations or disputes and said she moved to a different environment.

### D. *The Change of Circumstance Petition and Permanency Planning Rulings*

The juvenile court held a hearing to decide Mother's section 388 petition and permanency planning in April 2025. Regarding the section 388 petition, Mother argued there was a change in circumstances because Mother had participated in many programs. She asserted it would be in Minor's best interest to grant the petition because Minor loves Mother and enjoys visits.[4] Mother argued she had been doing a lot of work on herself, including learning new ways to handle stress and how best to talk to Minor.

The Department argued Mother completed many of the programs she identified prior to the court's issuance of the order bypassing family reunification services—meaning they were not necessarily new circumstances—and she was ordered to participate in some of the programs by the criminal court. The Department also argued some of the programs (e.g., the substance abuse program) were not part of the court's concerns regarding Mother's parenting. The Department stated individual therapy was one of the court's concerns, the reports indicated Mother changed therapists during the proceedings, it was unclear whether she was consistently participating in therapy, and she

---

[4] Prior to the hearing, Mother was visiting Minor two to three times per week, for two to three hours each time.

9

was not taking any medication. The Department also argued Mother seemed to lack insight into why Minor originally came before the court. The Department contended it was in Minor's best interests to stay in her placement, where her caretakers were consistently caring for her and taking her to services.

Minor's counsel acknowledged Mother was working hard to improve herself and had been consistently having good visits with Minor. However, Minor's counsel argued that it was not in her best interests to grant the petition given Mother's history.

The court acknowledged Mother participated in many programs and seemed to be trying to work on herself. But the court stated it did not believe Mother had shown a substantial change in circumstances considering the length of her criminal history and the fact that the dependency proceedings were precipitated by a crime. The court explained that given the amount of time Minor had been out of Mother's home and the stage of the proceedings, it was not in Minor's best interests to grant the petition.

The court also heard argument on permanency planning. Mother asked the court not to terminate her parental rights because the parental benefit exception applied. Mother asserted she had regular visitation with Minor, Minor is affectionate toward Mother, and there is a strong bond between Mother and Minor. Mother noted Minor looks forward to visits, is engaged with Mother during visits, and shows affection to her without prompting. Mother argued it would be destabilizing to Minor to lose her relationship with Mother. She also argued it would be in Minor's best interests to have a continuing relationship with Mother.

Father requested Minor be placed with paternal grandparents. He also objected to the termination of parental rights, asserting his lack of visits with Minor was due to his incarceration.

Minor's counsel acknowledged visits with Mother were positive but maintained the benefit of permanency with her loving foster home outweighed any detriment that would occur by termination of parental rights.

The Department conceded Mother was visiting with Minor on a regular basis, but it argued the preference was for the most permanent plan for Minor, which was adoption. The Department argued that even though Mother was visiting regularly, Minor's caregivers were still providing most of the parental support and were the ones facilitating Minor's extensive therapy. The Department also emphasized Minor had been in the care of her caregivers for around half her life and contended the benefits of a permanent plan with those caregivers outweighed any sort of bond between Minor and Mother.

The court stated that after reviewing the file and hearing arguments, it would find Mother had not met her burden to demonstrate the parental benefit exception applied. The court acknowledged Mother regularly visited Minor, but it found neither she nor Father had a beneficial relationship with Minor and, further, that terminating the parent-child relationships would not be detrimental to Minor.

Mother and Father filed separate appeals. Mother's briefing was completed first. In his opening brief, Father joined in Mother's opening and reply briefs and did not raise any additional arguments. We subsequently consolidated the appeals for purposes of oral argument and decision.

## II. DISCUSSION

The juvenile court's denial of Mother's change of circumstances petition was not an abuse of discretion. Even assuming for argument's sake that Mother showed changed circumstances, she did not establish commencing reunification services late in the proceedings was in Minor's best interests given the permanency and stability offered by her caregivers. Mother's challenge to the juvenile court's finding that the parental benefit exception does not apply, which is premised on the contention that the court's ruling was too cursory, also fails. The juvenile court was not required to explain its reasons for finding the exception does not apply and the record does not affirmatively demonstrate the juvenile court failed to apply settled law.

### A. *Section 388 Petition*

"Section 388 allows a parent or other person with an interest in a dependent child to petition the juvenile court to change, modify, or set aside any previous order. . . . The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) Where reunification services are terminated, "the parents' interest in the care, custody[,] and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation] . . . ." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) A court considering a child's best

interests in the context of a section 388 petition "must recognize this shift of focus . . . ." (*Ibid.*)

"[B]est interests is a complex idea" that requires consideration of a variety of factors. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530.) In determining whether a section 388 petitioner has made the requisite showing, the juvenile court may consider the entire factual and procedural history of the case including "factors such as the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner." (*Mickel O., supra,* 197 Cal.App.4th at 616.) We review a juvenile court's ruling for abuse of discretion. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415 [the decision on a section 388 petition "is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion"].)

Here, the juvenile court bypassed reunification services pursuant to section 361.5, subdivisions (b)(10) and (12), meaning it previously determined by clear and convincing evidence that Mother failed to reunify with Minor's half-sibling and had been convicted of a violent felony. We will assume for the sake of argument that Mother's participation in parenting and other classes, and the absence of additional criminal or violent conduct after dependency proceedings began, reflect a change in circumstances. We still conclude, however, that the the juvenile court did not abuse its discretion in denying her change of circumstance petition because she did not establish ordering family reunification services would be in Minor's best interests.

13

Minor had been in Mother's care for the first fifteen months of her life, but by the time of the section 388 hearing, Minor had been in a stable placement for over a year and her caregivers were intent on adopting her. Mother's contact with Minor during the entirety of the dependency proceedings was limited to monitored visitation. There was evidence that Minor enjoyed her visits with Mother, but there was no evidence Minor was notably eager at the start of visits, upset at the end of visits, or otherwise manifested a desire for more contact with Mother. There was also evidence that Minor was happy, healthy, and well-bonded with her caregivers, with whom she had spent almost as much of her life with as she spent with Mother. She was doing well in their stable home and referred to one of her caregivers as "mommy." Given the late stage of the proceedings, Minor's need for permanency and stability was the juvenile court's "foremost concern." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 594.) It was not unreasonable for the juvenile court to conclude Minor's best interests would not be served by attempts at reunification and the resulting delay in implementing the permanent plan.[5]

In addition to the evidence-focused challenge to the court's exercise of discretion that we have rejected, Mother also

---

[5] Additionally, Mother's petition, which generally asserts Minor would benefit emotionally and mentally from being in Mother's care, did not specifically explain how granting the petition would be in Minor's best interests. Though the petition did assert Minor had a strong bond with maternal relatives and her brother, the record indicates she only had one visit with her brother or any other maternal relatives during the dependency proceedings. Father's parents visited with Minor numerous times, but Mother's did not.

complains the juvenile court applied the wrong legal standard in determining the requested change would not be in Minor's best interests because the court did not expressly discuss the factors identified in *Kimberly F.*, *supra*, 56 Cal.App.4th 519. *Kimberly F.* enumerated the following non-exhaustive list of factors to be considered in evaluating the "best interests" prong of a section 388 petition: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Id.* at 532.)

Mother's argument fails for several reasons. The law does not require a juvenile court to expressly consider the *Kimberly F.* factors. Additionally, though the only factor the court mentioned on the record at the hearing was the length of time Minor had been out of Mother's home, nothing in the record suggests the court was not aware of or did not consider other relevant factors. Mother's complaint that the length of time Minor was out of her home is not a factor identified by *Kimberly F.* is meritless because *Kimberly F.* did not purport to identify every possible relevant factor and because, at the stage of dependency proceedings involved here, "the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

Moreover, the juvenile court's ruling was within its discretion even if analyzed solely within the confines of the *Kimberly F.* framework. The problem that led to the dependency proceedings was Mother's decision to leave then 15-month-old Minor home alone for hours in order to reengage in a conflict with

15

a third party.  Though Mother told the dependency court she would make different choices after participating in parenting courses, her focus was on calling the police—presumably to address the conflict between her and the third party.  There is no indication in the record that Mother addressed the core of the problem as it related to Minor: that Mother endangered her by leaving her alone on a mattress in an apartment with items that could have caused Minor harm had she woken and moved about without supervision.  Mother did not acknowledge she had endangered Minor in this manner during the proceedings, and thus did not actually ameliorate the problem.  As for the strength of the relative bonds, Mother focuses on the bond between herself and Minor.  While the record supports her assertion that Minor enjoyed her visits with Mother, it goes no further than that, and that is not far enough to countermand the court's discretionary determination in light of the other considerations we have already discussed.

> ### B.      *Termination of Parental Rights*

If a juvenile court finds by clear and convincing evidence at the section 366.26 hearing that a child is likely to be adopted, "the court shall terminate parental rights and order the child placed for adoption" unless, as relevant here, it "finds a compelling reason for determining that termination would be detrimental to the child due to one or more" enumerated exceptions.  (§ 366.26, subds. (c)(1) & (c)(1)(B); see also *In re Caden C.* (2021) 11 Cal.5th 614, 630-631.)  "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

16

The exception at issue here, the parental benefit exception, applies if "termination would be detrimental to the child" because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A parent invoking the exception in an effort to forestall termination of parental rights bears the burden to demonstrate three things by a preponderance of the evidence. First, the parent must show he or she had "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C.*, *supra*, 11 Cal.5th at 636.) Second, the parent must show "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Ibid.*) This element is affected by "'[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at 632 [in conducting this assessment, "courts often consider how children feel about, interact with, look to, or talk about their parents"].) Third, the parent must show that "terminating that [parental] attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at 636.) Ordinarily, our review of the juvenile court's ruling on the parental benefit exception is for substantial evidence on the first two of these elements and for abuse of discretion on the third. (*Id.* at 639-640.)

Mother's sole argument on appeal, however, is that the court's order terminating parental rights must be reversed because the court did not expressly consider the elements of the second and third prong of the parental benefit test outlined in

17

*Caden C.* This is unpersuasive. The record does not indicate the statements the juvenile court made during the hearing were "intended to be a comprehensive recitation of the grounds for its decision" (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156) and, as precedent holds, we "infer from section 366.26, subdivision (c)(1)(D)—under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights would be detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination would not be detrimental" (*Ibid*.).

Though Mother cites several cases where courts have found it appropriate to remand a parental benefit determination for further proceedings, none support her contention that the juvenile court was required to make express findings to support its ruling here. In most of the cited cases, the juvenile court found the parental benefit exception did not apply prior to the Supreme Court's decision in *Caden C.* The courts of appeal, reviewing the cases after *Caden C.* was decided, reversed the juvenile court orders either because the record affirmatively disclosed the juvenile court based its ruling on improper factors under *Caden C.* (*In re D.M.* (2021) 71 Cal.App.5th 261, 264) or because the appellate court could not assess whether the juvenile court had done so (*In re D.P.* (2022) 76 Cal.App.5th 153, 168-169; *In re J.D.* (2021) 70 Cal.App.5th 833, 854). Here, by contrast, where *Caden C.* is well-established law, "[w]e presume the trial court followed applicable law" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956), and the court expressly stated that Mother did not meet the requirements of *Caden C.*

Mother's reliance on *In re L.A.-O.* (2021) 73 Cal.App.5th 197 to support the proposition that remand is required where a court's ruling is "terse" is similarly unavailing. The court in *L.A.-O.* remanded not simply due to a paucity of express analysis but because the juvenile court's ruling found parents had not acted in a "parental role" and its use of the term created doubt about whether the court analyzed legally correct factors. (*Id.* at 211-212.) Similarly, the appellate court in *In re M.V.* (2023) 87 Cal.App.5th 1155, remanded for multiple reasons, including because the juvenile court based its decision to terminate parental rights on improper factors. (*Id.* at 1185-1186.) Mother does not identify any improper factors the juvenile court considered here.[6]

---

[6] At most, Mother contends some of the arguments made by counsel urged the court to base its ruling on improper factors. But there is no indication in the record the court did so.

DISPOSITION

The juvenile court's orders are affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.


We concur:



MOOR, J.



KIM (D.), J.